IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

LEE JUPITER,

      Petitioner,

v.                                      CASE NO. 1:09-cv-15-MP-GRJ

WALTER A. MCNEIL,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

This case is before the Court on Doc. 10, Petitioner's *pro se* amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The amended petition stems from Petitioner's Alachua County convictions for one count of conspiracy to kidnap, one count of false imprisonment and one count of third degree murder with a firearm. Petitioner contends that his constitutional rights were violated: (i) when the state charged him by means of a defective indictment, (ii) by the intentional misconduct by the prosecution in his state trial, and (iii) by the state's withholding of five pieces of exculpatory information. Respondent has filed a response and exhibits in support of the response. (Doc. 19.) Petitioner did not file a reply despite being provided with an opportunity to do so. Upon due consideration of the amended petition, the response, and the state-court record, the undersigned recommends that the amended petition be denied.[1]

## State-Court Proceedings

Because the issues involved in the Court's consideration of the amended petition are concentrated heavily on the procedural aspects of this case, and in particular on

---

[1] Because the Court may resolve the amended petition on the basis of the record, the Court has determined that an evidentiary hearing is not warranted. *See* Rule 8, Rules Governing Habeas Corpus Petitions Under Section 2254.

whether Petitioner exhausted his available state court remedies, the Court will focus its discussion of the state court proceedings accordingly.  *See* Doc. 19 and attached exhibits.  To the extent facts and testimony from Petitioner's state court proceedings are relevant to one of his three claims in the amended petition, then the Court will discuss those facts and testimony.

Petitioner's state criminal proceedings involved a drug deal gone bad.  This deal involved Scott Chretien and the murder victim, Ralph Vasquez.  Chretien was a drug dealer who sold marijuana.  (Ex. C at 1908.)  Chretien testified at Petitioner's trial and stated he had first met Petitioner in approximately June or July 1997 through Chretien's wife.  (*Id.* at 1907.)  Chretien stated he had met Ralph Vasquez on December 12, 1997 through a third party, Fernando Capablanca.  (*Id.* at 1918.)  Capablanca called Chretien on December 12, 1997 to tell Chretien Capablanca had a friend (Ralph Vasquez) who could obtain some marijuana very cheaply.  (*Id.*)  Mr. Chretien met Capablanca at Capablanca's apartment and told Capablanca he would like to buy five pounds of marijuana from Vasquez for approximately $3,700.  (*Id.* at 1918-19.)

Chretien, Capablanca, and Vasquez all met at Capablanca's apartment later that evening and then drove to a different apartment complex where Vasquez said they would retrieve the marijuana.  (*Id.* at 1920.) When they arrived at the second apartment complex, Vasquez asked for the money and said he would go inside to retrieve the marijuana.  (*Id.* at 1922.)  Chretien handed Vasquez the money and Vasquez got out of the car and walked towards the apartment building, but then disappeared.  (*Id.* at 1922.)  Chretien and Capablanca waited for about 30 minutes and then started knocking on apartment doors in an unsuccessful attempt to find Vasquez.  (*Id.* at 1923.)  The two

returned to Capablanca's apartment and Capablanca said he did not know how to contact Vasquez, but gave Chretien the names of Michelle White and Samman Ricci, two individuals who he thought might know Vasquez.  (*Id.* at 1924.)  Chretien then called White and Ricci, explained he had been ripped off by Vasquez and asked them to call him if they heard from Vasquez.  (*Id.* at 1924-25.)

Ralph Vasquez called the apartment shared by Michelle White and Ricci on December 13, 1997 at 3:00 or 4:00 p.m. and told Ricci he had an ounce of cocaine to sell.  (*Id.* at 2056.)  Ricci told Vasquez to bring some of the cocaine over to the apartment later in the afternoon so Ricci could show it to someone and see if they would like to buy it, which Vasquez did.  (*Id.* at 2056-57.)  Ricci then told Vasquez to come back at around 7:30 that evening. (*Id.* at 2057.)  Michelle White and Ricci then called Chretien to inform Chretien Vasquez had contacted them and was due to stop by their apartment later that evening.  (*Id.* at 1926-27, 2059.)

Chretien called Petitioner and Anthony Jones to ask them for help in recovering his money from Vasquez.  (*Id.* at 1927.)  Petitioner, Chretien's friend Mike Gibbons, and Chretien went over to Jones's apartment and met up with Jones and Jones's friend Ryan Reynolds.  (*Id.* at 1929-30.)  From there, the group headed to Ricci and Michelle White's apartment and upon arrival at the apartment discussed how they would ambush Vasquez.  (*Id.* at 1932-33.)  The plan was for Chretien, Gibbons and Anthony Escalante, another individual who was already present at Ricci and White's apartment, to wait in a downstairs apartment belonging to Jennifer Watson, a friend of Ricci and White's, and block the stairway in the event Vasquez escaped.  (*Id.* at 1934.)  Petitioner, Jones and several others would lie in wait for Vasquez in Ricci and White's apartment.  (*Id.*)  Jones

was hiding in the kitchen of the apartment with a shotgun, while Petitioner was in the bathroom with a baseball bat.  (*Id.* at 2062-63.)

Upon Vasquez's arrival at Ricci and White's apartment, Ricci led Vasquez towards the bathroom, at which point Petitioner emerged from the bathroom, said something in Spanish to Vasquez and hit Vasquez on the head with a baseball bat.  (*Id.* at 2067.)  Chretien, Gibbons and Escalante then entered the apartment from their hiding spot in the apartment downstairs and saw Vasquez lying on the floor bleeding from his head.  (*Id.* at 1936-37.)  Chretien then tied Vasquez up, searched Vasquez, found about $700 and took this money.  (*Id.* at 1937-38. )  While Chretien was questioning Vasquez as to the location of Chretien's money, Petitioner pulled out a pistol, pointed it at Vasquez and instructed Vasquez to "chill out."  (*Id.* at 1940.)  Vasquez told Chretien they could call the pager of Vasquez's brother in law, Andrew Fulford, and Vasquez's brother in law would be able to get the drug money for them.  (*Id.* at 1942.)

The group decided to take Vasquez to Chretien's apartment. Vasquez was blindfolded and placed into Petitioner's car.  (*Id.* at 1943-44.)  Petitioner and Escalante rode in Petitioner's car and took Vasquez to Chretien's apartment.  (*Id.* at 1945.)  Before Chretien left, he searched a red pickup truck Vasquez had arrived in to Ricci and Watson's apartment in but did not find anything.  (*Id.* at 1953.)  Jennifer Watson dropped Chretien at his apartment.  (*Id.* at 1947.)  Chretien, Watson, Petitioner, Escalante and Vasquez all waited for Anthony Jones to show up with Chretien's keys, as Jones had inadvertently taken them after the ambush.  (*Id.* at 1951.)  When Anthony Jones arrived with the keys, Vasquez was taken inside Chretien's apartment and placed on top of a sheet Chretien had placed over the floor.  (*Id.* at 1951-52.)  Vasquez's blindfold was

removed and Vasquez supplied Chretien with the pager number of Vasquez's brother in law, Andrew Fulford.  (*Id.* at 1953.)

Chretien then called Fernando Capablanca and asked Capablanca to page Fulford so Chretien's phone number would not appear on Fulford's pager.  (*Id.* at 1953.) Capablanca called the number Vasquez provided, but no response was forthcoming.  (*Id.* at 1954.)  While Capablanca was calling Fulford's pager, Vasquez told Chretien there were drugs in a bag under the front seat of the red truck.  (*Id.* at 1958.)  Chretien called Watson and Ricci, who informed Chretien the truck had been parked behind a strip mall and the keys locked inside after Chretien had left the apartment.  (*Id.* at 1958-59.)

Chretien then picked up Capablanca and Scott Branham, a friend of Capablanca's, and the three drove to the strip mall where the truck was parked.  (*Id.* at 1963.)  Capablanca broke the glass in the back window of the truck with a hammer and used some cleaning solution to erase any fingerprints while Chretien searched the truck. (*Id.* at 1963-64.)  Chretien found a black bag with some drugs and money in the truck and the three quickly left.  (*Id.* at 1964.)  On the way back to Chretien's apartment Capablanca searched the bag and found about $1,200 worth of cocaine, crack cocaine, marijuana, and pills. (*Id.* at 1964-65.)

When they arrived back at Chretien's apartment, Petitioner snorted some of the cocaine found in the bag.  (*Id.* at 1964-66.)  The group then discussed what to do with Vasquez, who was bleeding quite badly and clearly in need of medical attention. (*Id.* at 1967.)  Jones and Capablanca were in favor of taking Vasquez to the hospital, while several others were concerned Vasquez would attempt to get back at them if they released him.  (*Id.* at 1967-68.)   Accordingly, the possibility of murdering Vasquez and

dumping his body in the woods was discussed.  (*Id.*)

Chris Buttermore, Petitioner's roommate, arrived at Chretien's apartment at some time between 3:00 and 4:00 a.m. after Petitioner had summoned him by telephone.  (*Id.* at 1975, 1981.)  By this time Petitioner had taken charge of dealing with Vasquez, according to Chretien, who testified Petitioner "told me that he was going to take care of situation" because Chretien was scared.  (*Id.* at 1978-79, 2039-40.)  Buttermore and Petitioner briefly talked alone in Chretien's bedroom.  (*Id.* at 1981.)  Escalante suggested they take Vasquez to Watermelon Pond, a pond so infested with alligators no one ever visited it. (*Id.* at 1978.)  Petitioner asked Escalante if Escalante could go with Petitioner and show him the location of the pond.  (*Id.* at 1979.)

Around 4:00 a.m., Vasquez was tied up again, a pillowcase was placed over his head and he was put in the backseat of Petitioner's car by Buttermore, Petitioner and Escalante.  (*Id.* at 1981-83.)   Escalante and Petitioner got into Petitioner's car, with Petitioner driving, and Buttermore followed in his own car.  (*Id.* at 1984.)

Anthony Escalante testified at Petitioner's trial that he directed Petitioner to Watermelon Pond.  (*Id.* at 2987.)  Buttermore's car ran out of gas along the way, so Buttermore jumped in Petitioner's car with Petitioner and Escalante.  (*Id.* at 2989.)  When the three arrived at Watermelon Pond, Petitioner took Vasquez out of the car, pointed a handgun at Vasquez's back and marched Vasquez out of sight.  (*Id.* at 2995-96.)  Escalante testified he then heard five or six gunshots and Petitioner returned to the car alone.  (*Id.* at 2997.)

Escalante and Petitioner returned to Chretien's apartment around 6:00 a.m after dropping Buttermore off at his car.  (*Id.* at 1985.)  Petitioner grabbed his baseball bat and

left while Escalante got a ride to work from Jennifer Watson.  (*Id.* at 1985.)  Chretien discarded all of the items in his apartment with a connection to Vasquez.  (*Id.* at 1988-89.)  Chretien later spoke to Petitioner on the telephone and expressed concern that Vasquez might have found his way back into town from the pond, but Petitioner assured Chretien Vasquez "won't be coming out" of the pond.  (*Id.* at 1989.)

On December 14, 1997 the body of Ralph Vasquez was discovered at Watermelon Pond by an employee of the Florida Department of Environmental Protection.  After an autopsy, it was determined Vasquez died from gunshot wounds.  During the course of the investigation into Vasquez's death, police arrested a number of individuals, including Petitioner.

Two individuals who interacted with Petitioner during his time spent in pretrial custody at the Alachua County Detention Center, Timothy Bennett and Rocky Williams, also testified at Petitioner's trial and both stated Petitioner had told them during his time at the detention center he had shot and killed Vasquez.  (*Id.* at 3249, 3262, 3284.)

On January 5, 1998 Petitioner was charged in a three-count indictment with: (1) conspiracy to kidnap in Count I, (2) kidnapping with a firearm in Count II, and (3) first degree murder with a firearm in Count III.  (Ex. B at 6-7.)  The indictment also named six other co-defendants.  (*Id.*)  Petitioner went to trial and, on October 18, 1999, was convicted of conspiracy to kidnap on Count I and the lesser included offenses of false imprisonment with a firearm (Count II) and third degree murder with a firearm (Count III).  On October 27, 1999, prior to sentencing, Petitioner filed a motion for a new trial based on alleged prosecutorial misconduct and newly discovered evidence. (Ex. G at 125-26.)  The trial court held an evidentiary hearing on February 16, 2000 to address this motion

and then denied it in a written order dated September 15, 2000.  (Ex. B at 2944-78.)

On December 20, 2000 Petitioner was sentenced to 23 years imprisonment.  (Ex. B at 3063-65.)  Petitioner appealed his convictions and sentence to the First District Court of Appeal.  (*Id.* at 3067.)  The state also filed a notice of cross-appeal on December 27, 2000 in which it argued the trial court erred in calculating the victim injury points on Petitioner's sentencing guidelines scoresheet.  The First District Court of Appeals affirmed Petitioner's conviction in an *en banc* opinion on November 15, 2002 but remanded the case to the trial court for resentencing on the calculation of Petitioner's victim injury points.  (Ex. F.)

At a resentencing hearing on June 15, 2004, Petitioner was again sentenced to a 23 years.  On June 14, 2005, Petitioner filed a *pro se* Motion For Post-Conviction Relief in which he argued, among other things, the indictment charging him was invalid under state law with respect to the kidnapping with a firearm and first degree murder with a firearm charges, respectively.  (Ex. G at 1-44.)

On January 23, 2007, through postconviction counsel, Petitioner filed an Amended Motion For Postconviction Relief.  (*Id.* at 82-105.)  This Amended Motion contained only a single claim, namely that the indictment under which Petitioner was charged was invalid under state law.  (*Id.* at 84.)  The trial court held an evidentiary hearing on this motion on April 3, 2007.  (Ex. H.)  Petitioner filed a Post-Hearing Memorandum of Law in the trial court the day after the hearing.  (Ex. G at 182-93.)  The trial court then denied the amended motion in an order dated July 2, 2007.  Petitioner then appealed this denial to the First District Court of Appeal on July 24, 2007.  The First District Court of Appeals affirmed the denial of Plaintiff's Amended Motion For Postconviction Relief per curiam

without a written opinion on September 25, 2008, with the mandate issuing on December 4, 2008.  (Exs. L and M.)

On December 31, 2008 Petitioner submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to prison officials for mailing, which was filed with this Court on January 20, 2009.  (Doc. 1.)  He submitted the instant amended petition to prison officials for mailing on March 9, 2009, which was filed with this Court on March 11, 2009. (Doc. 10.)

## Section 2254 Exhaustion Requirement

Before bringing a habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state post-conviction motion.  28 U.S.C. § 2254(b)(1), (c).  Exhaustion requires that prisoners give the state courts a "full and fair opportunity" to resolve all federal constitutional claims by "invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  To properly exhaust a federal claim, a petitioner must "fairly present" the claim in each appropriate state court, thereby affording the state courts a meaningful opportunity to "pass upon and correct alleged violations of its prisoners' federal rights."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotation omitted).

When a petitioner fails to properly exhaust a federal claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred under state law, the claim is procedurally defaulted.  *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999). Federal habeas courts are precluded from reviewing the merits of procedurally defaulted claims unless the petitioner can show either (1) cause for the failure to properly present

the claim and actual prejudice from the default, or (2) that a fundamental miscarriage of justice would result if the claim were not considered. *Id*. at 1302, 1306.  A fundamental miscarriage of justice exists "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010).  To state a credible claim of actual innocence, a petitioner must present new reliable evidence that was not presented at trial showing that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

### Section 2254 Standard of Review

For properly exhausted claims, there are limitations on this court's review of state court findings of fact.  Under 28 U.S.C. § 2254(d)(2), a federal court may not grant a state prisoner's application for a writ of habeas corpus based on a claim already adjudicated on the merits in state court unless that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower

federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings. *Hawkins v. Alabama,* 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted) ("The decisions of other federal circuit courts (and our decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the decisions demonstrate that the Supreme Court's pre-existing, clearly established law compelled the circuit courts (and by implication would compel a state court) to decide in a definite way the case before them."). *See also Carey v. Musladin,* 549 U.S. 70, 74-77 (2006) (§ 2254 refers to holdings, rather than *dicta,* of the Supreme Court, collecting circuit cases "[r]eflecting the lack of guidance from this Court," on the issue).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. *Williams v. Taylor,* 529 U.S. 362, 404-406 (2000); *Bell v. Cone,* 535 U.S. 685, 694 (2002) (citing *Williams* ).  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams,* 529 U.S. at 412-13. "Avoiding these pitfalls [described in *Williams v. Taylor*] does not require citation of our cases-indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8  (2002) (emphasis in original). Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before

it." *Holland v. Jackson,* 542 U.S. 649, 652 (2004).

## Petitioner's Claims

Petitioner asserts three grounds for post-conviction relief in his amended petition.

Respondent concedes the amended petition was timely filed but contends this Court

does not possess jurisdiction over Petitioner's first claim because that claim is a state law

matter as well as unexhausted. Respondent also contends the second claim is similarly

unexhausted.  Respondent concedes Petitioner's third claim in the amended petition has

been exhausted and is properly before this Court.  The Court will address each claim in

the order in which they are presented in the amended petition.

### 1.    Petitioner's Due Process Claim With Respect To His Indictment

Petitioner's first claim in the amended petition is a due process claim under the

Fourteenth Amendment.  He contends he was denied due process because the

indictment charging him with first degree murder failed to comport with state law and thus

did not properly confer jurisdiction upon the state trial court with respect to Count III, the

first degree murder charge.  He argues this resulted in Petitioner being deprived of his

state-created right to be charged with first degree murder only by means of an indictment.

There is no federal right to be charged with a state crime by means of an

indictment. *Hurtado v. California***,** 110 U.S. 516 (1884)(due process guarantee does not

require an indictment by a grand jury in a state murder prosecution); *see also Apprendi v.*

*New Jersey*, 530 U.S. 466, 477 n.3 (2000)("[The Fourteenth] Amendment has not,

however, been construed to include the Fifth Amendment right to 'presentment or

indictment of a Grand Jury ...'").  The Supreme Court, however, has "repeatedly held that

state statutes may create liberty interests that are entitled to the procedural protections of

the Due Process Clause of the Fourteenth Amendment." *Vitek v. Jones*, 445 U.S. 480,

488 (1980).  There is no federal constitutional right to such state-created rights, but once

a state has created such a right it may not be "arbitrarily abrogated." *Wolff v. McDonnell*,

418 U.S. 539, (1974).  The rationale for this protection is that such state created rights,

once created by the state, then constitute liberty interests protected by the Due Process

Clause of the Fourteenth Amendment.  *Vitek*, 445 U.S. at 282.  Like any other state-

created right, once a state has provided a right to be charged with certain crimes only by

indictment, then the state cannot cause that right to be forfeited in an arbitrary or

fundamentally unfair manner.  *See*, *e.g.*, *Jones v. Keane*, 250 F. Supp. 2d 217, 234

(W.D.N.Y. 2002)(right to a grand jury indictment under New York state constitution

cannot be forfeited in an unfair or arbitrary manner and must conform with the due

process clause of the Fourteenth Amendment).

Under Florida law Petitioner has the right to be charged with first degree murder

only by means of an indictment returned by a grand jury.  Fla. Const. Art. I, § 15(a) ("No

person shall be tried for capital crime without presentment or indictment by a grand jury

..."); Fla. R. Crim. Pro. 3.140(a)(1) ("An offense that may be punished by death shall be

prosecuted by indictment."). This state-created right thus constitutes a liberty interest

protected by the Due Process Clause of the Fourteenth Amendment.  Accordingly, the

state of Florida cannot deprive Petitioner of this liberty interest in an unfair or arbitrary

manner.

According to Petitioner, the specific problem with the indictment is that Count III of

the indictment's fails to contain the words "THE GRAND JURORS OF THE STATE OF

FLORIDA, enquiring in and for the body of the County of ALACHUA, upon their oaths

present that ..."  Thus, Petitioner argues that because the indictment in Count III failed  to

contain the words "THE GRAND JURORS OF THE STATE OF FLORIDA, enquiring in

and for the body of the County of ALACHUA, upon their oaths present that ..."  the

indictment is invalid under Florida law with respect to the first degree murder charge.

Petitioner contends that as drafted the charge in Count III reads as though Rod Smith,

then-State Attorney for the Eighth Judicial Circuit, was charging him with first degree

murder by means of an information.  Petitioner concludes that his federal due process

rights were violated because his right to be charged with first degree murder solely by

means of an indictment returned by a grand jury was arbitrarily denied. According to

Petitioner, this issue was raised in his state Fla R. Crim P. 3.850 motion for

postconviction relief and on appeal from the denial of this postconviction motion by the

state trial court.  (Doc. 10 at 11.)

        A review of the record discloses, however, that the federal due process issue was

not raised in state court and therefore was not properly exhausted. In the trial court and

before the First District Court of Appeal Petitioner challenged the sufficiency of the

indictment under state law but never raised the issue that his federal due process rights

were violated. Accordingly, for this reason, Petitioner's first claim in the amended petition

is unexhausted and therefore is not cognizable on federal habeas review.

        In the trial court and on appeal Petitioner's filings for postconviction review

disclose that Petitioner only challenged the indictment under state law and the Fifth

Amendment. There was no due process challenge under the Fourteenth Amendment.

*See, e.g.*, Petitioner's Amended Motion For Postconviction Relief (Ex. G at 86)("Mr

Jupiter now files the agreed-upon Amended Motion for Postconviction Relief with an

attached Memorandum of Law addressing only one claim–that his indictment was legally defective and that such error warrants that two of his three convictions be reversed and a new sentencing hearing held."); Petitioner's Initial Brief to the First District Court of Appeal (Ex. I at 7) ("Under both the Florida Constitution and the fifth amendment to the federal constitution, Mr. Jupiter's convictions on Count II and III must be vacated.").

Similarly, on direct appeal, while Petitioner challenged the denial of his motion for a mistrial and denial of his  motion for a new trial there was no mention of a violation of Petitioner's federal due process rights nor any attempt by Petitioner to raise this claim on either state direct appeal or postconviction review. (Ex. D.) Accordingly, Petitioner never fairly presented the federal due process issue to the state courts and thus Petitioner is not entitled to federal habeas review of this claim.

Other federal courts also have concluded that claims like that advanced by Petitioner here are unexhausted where a state prisoner challenged the sufficiency of an indictment under state law in the state courts and then sought to advance a federal due process claim with respect to the indictment.  In a New York case cited by Petitioner, the court agreed with Petitioner's contention that a state cannot create the right to be charged with a certain crime by indictment by a grand jury and then arbitrarily abrogate that right. *Jelinek v. Costello*, 247 F. Supp. 2d 212, 278-79 (E.D.N.Y. 2003).  The *Jelinek* court, however, also noted the petitioner in that case, like Petitioner here, had not explicitly raised the federal due process issue in state court and, accordingly, found the claim unexhausted.  *Id.* at 279 ("In order for such a claim to be reviewed by a federal habeas court, however, a petitioner must have explicitly raised the *federal* issue in state court.").  This approach is consistent with the view of other federal courts confronted with

similar claims on federal habeas review.  *See*, *e.g.*, *Dennis v. Henderson*, No. 99 Civ

0693, 1989 WL 115866, at *2 (S.D.N.Y. Sept. 28, 1989)(dismissing as unexhausted a

New York state prisoner's habeas claim that he was never informed of the charges

against him because his state postconviction motions were "based entirely on state law

and were insufficient to put the state court on notice they were to decide federal

constitutional claims").

In sum, Petitioner failed to present his federal due process argument regarding the

sufficiency of the indictment charging him with first degree murder to the Florida state

courts on either postconviction review or direct appeal and thus Petitioner's first claim in

the amended petition is foreclosed from federal collateral review as unexhausted.

### 2.    Petitioner's Due Process Claim With Respect To Prosecutorial Misconduct

The second ground raised in the amended petition is also a federal due process

claim.  Petitioner contends the prosecution engaged in intentional misconduct intended to

arouse the emotions and fears of the jury, depriving him of a fair trial in violation of the

Due Process Clause of the Fourteenth Amendment.  This alleged misconduct involved

the testimony of one of the other individuals involved in the death of Ralph Vasquez,

Anthony Jones.

Anthony Jones testified at Petitioner's trial.  Jones' involvement in the murder

involved the following. Scott Chretien informed Jones he had been ripped off by Ralph

Vasquez  the day after Vasquez disappeared with Chretien's money.  (Ex. C at 2667.)

Chretien paged Jones later that day and informed Jones he had located Vasquez and

asked Jones to accompany him as "back up, as security" in Chretien's effort to collect the

stolen money from Vasquez.  (*Id.* at 2669.)  Reynolds also agreed to come along with

Jones and the two met Chretien, Petitioner and Mike Gibbons at Jones's apartment.   (*Id.*
at 2670-71.)

The group later headed over to Michelle Watson and Samman Ricci's apartment
in order to ambush Vasquez.  (*Id.* at 2674.)  When they arrived at Watson and Ricci's
apartment, Petitioner gave Reynolds a set of brass knuckles and Jones a shotgun out of
Petitioner's trunk.  (*Id.* at 2674-75.)  Jones hid in the kitchen and heard a commotion
shortly after Vasquez arrived.  (*Id.* at 2680-81.)  Shortly thereafter Vasquez came running
out of the hallway and Jones grabbed Vasquez, put him in a choke hold and then the two
broke a window as they struggled.  (*Id.* at 2681.)  While Jones and Vasquez struggled,
Petitioner hit Vasquez in the head with the baseball bat while Reynolds hit Vasquez in the
face with the brass knuckles.  (*Id.* at 2681-82.)

After the ambush at Ricci and Watson's apartment, Jones went to Texas with his
family, where he monitored the progress of the investigation into Vasquez's death
through the Internet.  (*Id.* at 2713.)  He returned to Gainesville briefly, but then returned to
Texas again for another two weeks after becoming frightened he would be arrested if he
remained in Gainesville.  (*Id.*)  While in Texas for the second time, he bought airline
tickets to several different destinations on several different airlines in an effort to confuse
any law enforcement personnel attempting to track him down.  (*Id.* at 2713-14.)  He then
took a flight to New York and from there took another flight to Germany, his home
country, and then took a train to Austria.  (*Id.* at 2714.)

Jones spent several months in Austria studying at a university in Vienna before he
was arrested by Austrian and Interpol officials on May 4, 1998.  (*Id.* at 2715-16.)  While in
custody in Austria awaiting extradition, Jones wrote a letter to Austrian immigration

officials in German in which he claimed not to speak German.  He was extradited to the United States on December 4, 1998 and brought back to Alachua County.  (*Id.* at 2716.) Jones ultimately plead guilty to conspiracy to commit kidnapping and was sentenced to 65 months imprisonment.

Jones testified at Petitioner's trial as a prosecution witness and stated on direct examination: "I speak fluent German."  (*Id.* at 2715.)  During cross-examination, Petitioner's counsel asked Jones about the letter Jones wrote to the Austrian immigration officials in German.  (*Id.* at 2775.)  Petitioner's trial counsel then asked Jones to read a portion of the letter.  (*Id.* at 2775-76.)   In the last line of the letter, Jones stated "'I do not speak German very well.  I also can't read German.'" (*Id.* at 2776.)  After Jones read that line, Petitioner's counsel then asked Jones whether he actually did speak fluent German or not and Jones stated "I speak it fluently."  (*Id.*)  Petitioner's trial counsel then asked Jones if the statement in the last line of the letter was incorrect, to which Jones responded "That's correct.  It was all done for the European convention."[2]  (*Id.* at 2776.)

On redirect examination, Jones was then asked by the prosecution to read the opening paragraph of the letter, ostensibly under the doctrine of completeness.  (*Id.* at 2787.)  Jones read the paragraph, which provided:  "'Several persons were involved in this matter.  A man with a first name of Lee committed murder.  I did not know his last name.  This Lee is a member of the Mafia.  I'm afraid - -'" (*Id.* at 2787-88.)

Defense counsel immediately objected to the statement read by Jones and requested a mistrial based on the statements that Petitioner was a member of the Mafia

---

[2] Jones was apparently attempting to invoke a particular international convention in order to avoid extradition and the letter was part of that effort.

and had committed the murder of Ralph Vasquez (hereinafter referred to as the

"murderer/Mafia comments").  (*Id*. at 2787.)  The prosecution then asked several more

questions to Jones on redirect and the jury was sent out, but not before the judge issued

a curative instruction to the juror to disregard the murderer/Mafia comments.[3]   Once the

jury had been sent out to lunch, the trial court then heard argument on whether a mistrial

should be granted and ultimately denied the motion. (*Id*. at 2792-94.)

Petitioner asserts that he raised the issue of a federal due process violation

connected with the murderer/Mafia comments on his state direct appeal.  (Doc. 10 at 21.)

While Petitioner raised the issue of prosecutorial misconduct connected with the

murderer/Mafia comment on direct appeal, he raised it as an evidentiary issue and not

as a federal due process issue.  In his initial brief on direct appeal, Petitioner argued the

following: "The trial court abused its discretion by denying the Motion for Mistrial

requested by Appellant Jupiter after the state intentionally interjected that Appellant

Jupiter committed murder and that he or his family was involved with the 'Mafia' or

organized crime.  The impermissible comments constituted both a comment on the

ultimate issue by a lay witness and a highly prejudicial inference placed intentionally by

the state before the jury."  (Ex. D at 26.)  Petitioner argued the introduction of this

statement "irreparably created an issue of the [Petitioner] in the minds of a jury as a

dangerous 'gangster'" and "[t]he jury was free to imply the guilt of the [Petitioner] from the

---

[3] The state trial court issued the following curative instruction: "I will instruct the jury on this: The rule of completeness is basically a document, basically a doctrine of law, that says in order for the jury to consider a piece of a writing or a portion of a statement reduced to writing that the other side, in fairness, can produce other parts about the document, if it's related to the parts that have been produced.  I'm going to tell you that as a rule of law in this case, the portion of the document that [the prosecutor] was questioning [Jones] on is not related to that.  It does not qualify under the rule of completeness, and you are to disregard it, period, in its entirety, as to the questions asked about that paragraph, everything in it. Do not consider that in whatever deliberations you may be able to reach at some time in this case." (Ex. C at 2789-90.)

express assertion by Mr. Jones and an illusory connection with organized crime." (*Id.* at 27-28.)  Petitioner then contended the comment introduced such prejudice to the proceedings that no curative instruction could possibly have removed the prejudice he suffered as a result of the remark.  (*Id.* at 28-29.)

Although Petitioner's argument on direct appeal directly addressed the murderer/Maffia comment Petitioner never argued or alluded to due process or make the state court aware he was attempting to invoke the Fourteenth Amendment's Due Process Clause in connection with the murderer/Mafia comment.  Instead, Petitioner concentrated his argument on the trial court's purported abuse of discretion in denying his motion for a mistrial.  The First District Court of Appeal, in addressing this argument, specifically treated the issue as whether the trial court abused its discretion in denying Petitioner's motion for a mistrial and not as a federal constitutional claim.[4] (Ex. F.)

Petitioner never raised a federal due process claim regarding the murderer/Mafia comments elicited from Jones by the prosecution during his trial, during his state direct appeal or in his motion for state postconviction review.  Accordingly, the state courts were not given a full and fair opportunity to review Petitioner's due process claim regarding the introduction of the murderer/Mafia comments.  Petitioner's due process claim with respect to prosecutorial misconduct in connection with the murderer/Mafia comments is thus unexhausted and inappropriate for this Court to consider on federal collateral review.

---

[4] The relevant language from the First District Court of Appeal's opinion on this issue was as follows: "In this direct criminal appeal, appellant claims that the trial court abused its discretion when it denied a motion for a mistrial and a subsequent motion seeking a new trial. ... Because we conclude that appellant has failed to demonstrate that the trial court abused its discretion, we affirm as to the two issues raised by him without further discussion."  (Ex. F at 1-2.)

### 3.      Petitioner's Five *Brady* Claims

Petitioner's third claim in the amended petition consists of five separate claims

under *Brady v. Maryland* that the prosecution knowingly suppressed information

favorable to the Petitioner.   Respondent concedes this issue was exhausted at the state

court level and, accordingly, is appropriate for federal habeas review.

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process

where the evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In order to establish a *Brady*

violation Petitioner must establish three elements: (1) the evidence must be favorable to

the accused, because it is either exculpatory or impeaching; (2) the evidence must have

been suppressed by the State, either willfully or inadvertently; and (3) the evidence must

be material so as to establish prejudice.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

Evidence "favorable to an accused" includes both impeachment evidence and

exculpatory evidence.  *United States v. Bagley*, 473 U.S. 667, 676  (1985).  Evidence is

material if it creates "a reasonable probability that, had the evidence been disclosed to

the defense, the result of the proceeding would have been different.  A 'reasonable

probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682

(citing *Strickland v. Washington,* 466 U.S. 694, 668 (1984)); *see also Brown v. Head*, 272

F.3d 1308, 1316 (11th Cir. 2001) ("The prejudice component of an ineffective assistance

claim and the materiality component of a *Brady* claim both require the same thing ... a

reasonable probability of a different result in the proceeding.").

#### a.      The Purported *Brady* Violations

The basis for each of Petitioner's five *Brady* claim relates to the involvement of

Andrew Fulford, the brother-in-law of Ralph Vasquez, in Vasquez's death.  (Ex. C at

2271.)  Fulford testified at Petitioner's trial as a prosecution witness.  (*Id.* at 2269.)

Vasquez came to Fulford's house in High Springs, Florida on December 13, 1997, the

day Vasquez was ambushed, and asked to borrow Fulford's truck.  (*Id.* at 2271.)

Vasquez told Fulford he would pay any amount of money Fulford wished in order to rent

the truck, but Fulford declined to rent his truck to Vasquez because Vasquez did not have

a driver's license.  (*Id.*)  Vasquez remained at Fulford's house after Fulford declined his

request to use the truck.  (*Id.* at 2276-77.)  Later that afternoon, Fulford left home in

another car he also owned and, when he returned at 10:00 p.m., his truck was missing.

(*Id.* at 2271-72.)

　　　Upon his return home, Fulford informed his father and several other individuals

about the missing truck.  (*Id.* at 2273.)  Fulford's father called the Gainesville Police

Department ("GPD") to report the truck missing and Fulford's father received a call at

midnight that evening from GPD notifying him the truck had been found.  (*Id.*)  Fulford

and his father picked up the truck and, upon arriving at the location where the truck was

discovered, noticed the passenger side window was broken.  (*Id.* at 2273-74.)  Fulford

and his father took the truck back to a repair shop in High Springs owned by Fulford's

father and left the truck there for the evening.  (*Id.* at 2274-75.)

　　　Petitioner states the family of Ralph Vasquez disclosed five pieces of material

information related to Fulford's involvement in Ralph Vasquez's death to the prosecution

that were never disclosed to Petitioner until after his trial.  Those five pieces of

information were: (1) Andrew Fulford's alleged involvement in the drug deal gone bad

that lead to the murder of Ralph Vasquez ("the drug ripoff"); (2) an incident in which

Fulford apparently had threatened Ralph Vasquez by putting a knife to Ralph Vasquez's

throat several days prior to Vasquez's disappearance ( "the knife to neck incident"); (3)

Fulford's statements about Vasquez's disappearance and death prior to the discovery of

Vasquez's body at Watermelon Pond to his wife, Ralph Vasquez's sister (hereinafter

"Fulford's early notice"); (4) whether Fulford's truck was not stolen by Vasquez as Fulford

testified at Petitioner's trial but instead whether Fulford had given Vasquez permission to

use the truck ("the stolen truck"); and (5) Fulford's disposal of the gun and baseball bat

used in Vasquez's murder ("disposal of the gun and bat").

Petitioner presented his *Brady* claim regarding these five pieces of information in a

motion for a new trial filed with the state trial court on October 27, 1999.  (Ex. G at 125-

26.)  In his motion Petitioner contended the Vasquez family contacted Petitioner's

counsel after Petitioner's trial because the Vasquez family was concerned about the

veracity of Andrew Fulford's trial testimony.  The state trial court conducted an evidentiary

hearing on Petitioner's motion for a new trial on February 16, 2000.  (Ex. C at 3863-

4135.)  The Vasquez family apparently had been working with David Remers from the

victim's advocacy office of the State Attorney for the Eighth Judicial Cicruit and Heather

McCloud of the Alachua County victim's advocacy office as well as the State Attorney's

Office before, during and after Petitioner's trial.

Carmen Vasquez Owens, Ralph Vasquez's sister, and Christine Fulford, Ralph

Vasquez's sister and Andrew Fulford's wife, both testified at the February 16, 2000

evidentiary hearing the state court held on Petitioner's motion for a new trial.  (Ex. C at

3871-3927.)  Carmen Vasquez Owens stated Andrew Fulford's trial testimony was

untrue. (*Id.* at 3872.)  Ms. Vasquez Owens further testified she and other Vasquez family

members had met with the state attorney's office numerous times throughout Petitioner's

criminal proceedings as well as with both victim advocacy offices and informed them of

the five pieces of information Petitioner contends are *Brady* material.  (*Id.* at 3872-77.)

Christine Fulford also testified at the evidentiary hearing that she and her family had

brought all five pieces of information to the attention of the prosecution in Petitioner's

state court trial.  (*Id.* at 3907-27.)  Both victim advocates assigned to the Vasquez family,

the assistant state attorney who handled Petitioner's case, the lead GPD detective

investigating Ralph Vasquez's death, the State Attorney for the Eighth Judicial Circuit and

a number of other individuals also testified at the evidentiary hearing.

The state trial court issued an order on September 15, 2000 denying the

Petitioner's motion for a new trial.  (Ex. B at 2944-78.)  In this order, the state court

concluded the prosecution had only known about Fulford's involvement in the drug ripoff

and the knife to neck incident.  (*Id.* at 2958.)  The state trial court then examined each of

these two pieces of information under the tests set forth in both *Brady v. Maryland* and

*Giglio v. State*.[5]  (*Id.* at 2959-69.)  In examining the two pieces of information under

*Brady*, the state court concluded the evidence could not be considered exculpatory or

impeachment evidence.  (*Id.* at 2964-66.)  Furthermore, the state court noted the

prosecution had listed Fulford as a Category "A" witness on a discovery packet and

Petitioner could thus have deposed Fulford if he so chose.  (*Id.* at 2966-67.)  The state

court thus concluded the prosecution had not violated *Brady* in connection with any of

these five pieces of information and denied Petitioner's motion for a new trial.  (*Id.* at

2978.)  The denial was upheld by the First District Court of Appeal on appeal.  (Ex. F.)

---

[5] *Giglio v. State* only applies in instances where the prosecution offered false testimony and the state knew it to be false when offering it into evidence at a trial, which did not appear to be the case in Petitioner's trial with respect to the information Petitioner attributes to Fulford.  405 U.S. 150, 154 (1972). The Court will not examine this issue under the *Giglio* standard because Petitioner does not present that ground in his amended petition.

### b.     Legal Analysis of Petitioner's *Brady* Claims

As a preliminary matter, the Court notes the state court correctly chose *Brady* as the correct governing legal principle applicable to Plaintiff's claim regarding these five pieces of information and then applied that case and its progeny to Petitioner's five *Brady* claims. The Court will consider each of Petitioner's five *Brady* claims on a claim by claim basis below.

### i.     The Knife to Neck Incident

Petitioner contends the knife to neck incident showed Andrew Fulford had a reason to threaten Ralph Vasquez only days before Vasquez was actually murdered, which would have enabled Petitioner to demonstrate Fulford had a motive to harm or kill Vasquez. Petitioner states both victim advocates, the assistant state attorney who prosecuted him, the detective who led the investigation into Ralph Vasquez's death, and the State Attorney for the Eighth Judicial Circuit were all aware of this information.

The state trial court did not unreasonably apply the facts of the knife to neck incident to the *Brady* standard. As the state court correctly concluded, the knife to neck incident was neither exculpatory nor did it constitute useful impeachment evidence. (Ex. B at 2965-66.) As the state court noted, simply because Fulford threatened Vasquez with a knife at some unspecified point prior to the murder did not exculpate Petitioner, as no witness placed Fulford at either Watermelon Pond or the apartment at which Vasquez was held captive prior to his murder.. (*Id.* at 2966.) The knife to neck incident also would not be useful as impeachment evidence because, as the state court also noted, no other witness at Petitioner's trial mentioned Fulford besides Fulford himself. (*Id.* at 2966.) Similarly, this information "probably could not be used to impeach Fulford himself because there was nothing of particular import about his testimony." (*Id.*)

Even assuming *arguendo* the knife to neck incident was *Brady* material, because the prosecution listed Fulford as a Category "A" witness on its first discovery packet – and presumably Petitioner could have deposed Fulford – the state did not willfully or inadvertently suppress the identification of Fulford and any information he may have known. (*Id.* at 2967.)

Even assuming the knife to neck incident somehow satisfies the first two prongs of *Brady*, the knife to neck incident is not material under *Brady* because, as the state court also noted, there was a great deal of evidence tying Petitioner directly to the murder of Ralph Vasquez. As the state court noted, Anthony Escalante, a prosecution witness, testified at Petitioner's trial that he had driven to Watermelon Pond with Petitioner and Petitioner took Vasquez from the backseat, put a gun to Vasquez's back and then walked away with Vasquez. (Ex. B at 2968-69.) Escalante then further testified he had heard four or five gunshots and then Petitioner returned by himself. (*Id.*) The state court also noted Rocky Williams, who was in custody at the Alachua County Detention Center at the same time as Petitioner, testified Petitioner told Williams that Petitioner shot Vasquez five or six times, "dropped" Vasquez's body in the sand and then left no evidence at the scene of the crime. (*Id.* at 2969.) Moreover, as the state court further noted, none of the other witnesses at Petitioner's trial placed Fulford anywhere near the scene of Vasquez's beating or killing. (*Id.* at 2966.) Fulford's wife actually testified Fulford was with her entire afternoon and evening Vasquez was killed. (*Id.*) Accordingly, the state trial court correctly applied *Brady* to determine the knife to neck incident did not constitute a *Brady* violation by the prosecution and did so in a reasonable manner to the facts in this case.

### ii.    The Drug Ripoff

Petitioner also claims the prosecution committed a *Brady* violation in failing to disclose that Andrew Fulford was involved in the drug ripoff leading to Ralph Vasquez's death. This contention is without merit.

With respect to the drug ripoff, Petitioner contends this information is favorable to him because it tended to show Fulford had a motive to see Ralph Vasquez seriously harmed or killed.  The drug ripoff information does not constitute *Brady* material, however, because the information could not be used  as either exculpatory or impeachment evidence. (Ex. B at 2964-65.)  As the state trial court noted, if the drug ripoff information was accurate, then Fulford actually benefitted from the drug ripoff because he was able to keep the proceeds of the drug deal instead of Vasquez.  (*Id.* at 2964.)  Vasquez, however, could not testify to Fulford's participation in the ripoff and none of the other witnesses even mentioned Fulford's participation in the ripoff during their testimony on that issue at Petitioner's trial and thus there would be no testimony to impeach.  (*Id.*)  Accordingly, the state court correctly concluded the drug ripoff information did not meet the first prong of *Brady*.

The state court also reasonably concluded this information did not meet *Brady*'s second prong because the state listed Fulford on the state's first discovery packet.  (*Id.* at 2967.)  Even assuming the drug ripoff information was (a) *Brady* material and (b) withheld by the prosecution, Petitioner can not demonstrate that he suffered any prejudice as a result of the failure to disclose this information. At best this evidence would have done little more than inculpate Fulford as a participant in Vasquez's murder.  (*Id.* at 2968.)  It would not exculpate Petitioner in any way because, as discussed above, there was a wealth of evidence tying Petitioner directly to the murder.  Accordingly, the Court

concludes that the state court did not unreasonably find that the prosecution in
Petitioner's state court proceedings did not violate *Brady* by not disclosing to Petitioner
the drug ripoff information.

### iii.    Fulford's Early Notice of Ralph Vasquez's Death

Petitioner also claims the prosecution violated *Brady* by not disclosing Andrew
Fulford's early notice of Ralph Vasquez's death to him or his counsel.  Christine Fulford
testified at the evidentiary hearing on Petitioner's motion for a new trial that her husband
was sitting in a bathtub snorting cocaine when the local news reported the discovery of
Ralph Vasquez's body at Watermelon Pond.  (Ex. C at 3919.)  Christine Fulford went into
the bathroom to inform her husband of Ralph's death, to which Andrew Fulford
responded by stating Ralph was dead.  (*Id*.)  She also stated her husband had also made
reference to Ralph Vasquez's death to her the prior evening.  (*Id.* at 3912.)

The state court concluded the state was unaware of Fulford's early notice.  (*Id.* at
2957.)  In support of this conclusion, the state court noted State Attorney Rod Smith
testified at the evidentiary hearing that the Vasquez family never had asserted to him that
Andrew Fulford somehow had early notice of Ralph's death.  (*Id.* at 2957.)  Similarly, the
state court also noted Alachua County victim advocate Heather McCloud's evidentiary
hearing testimony, in which she stated the Vasquez family's only proof for this early
notice was Andrew Fulford's strange behavior.  (*Id.*)

Fulford's knowledge of Ralph Vasquez's death prior to the publication of that death
through the media is not material under *Brady* because it does nothing to lessen
Petitioner's involvement in the murder.  The state court quite reasonably concluded the
early notice did not constitute a *Brady* violation.  As the state court properly concluded,
the early notice information would, at best, serve to inculpate Fulford as an additional

participant in the death of Ralph Vasquez, but not exculpate Petitioner in any way.  (*Id.* at 2972.)  As discussed above, there was a wealth of evidence upon which Petitioner was convicted.  Accordingly, the state did not commit a *Brady* violation in failing to notify Petitioner that Andrew Fulford may have had early notice of Ralph Vasquez's death.

### iv.    Fulford's Disposal of the Gun and Bat

Petitioner also claims the prosecution violated *Brady* by not disclosing Christine Fulford's assertion that her husband told her he had disposed of the gun and baseball bat used in killing Ralph Vasquez.  Christine Fulford testified at the evidentiary hearing she was engaged in an argument with Andrew Fulford at a Christmas party several weeks after Ralph Vasquez's death when he stated he had disposed of the gun and baseball bat used in Ralph's murder.  (Ex. C at 3912, 3921.)  Two other witnesses at the evidentiary hearing also present at the Christmas party confirmed Andrew Fulford's statement to his wife.  (*Id.* at 4006-07, 4016-17.)

Andrew Fulford's gun and bat disposal comment does not constitute *Brady* material as the state trial court reasonably concluded.  (*Id.* at 2972.) This information has no value in exculpating Petitioner because Andrew Fulford's possession of the gun and bat after the murder has no relevance to whether Petitioner used the gun or bat in murdering Vasquez.  (*Id.*)  Nor could this evidence be used to impeach Fulford because there was no testimony tying Fulford to Vasquez's murder.  (*Id.* at 1965.)  It is also questionable whether the state actually was in possession of this information. As the state court noted, not a single member of the State Attorney's Office recalled Christine Fulford or anyone else having brought this information to the attention of that office.  (*Id.* at 2956.)

Even assuming the disposal of the gun and bat somehow constituted *Brady*

material or was known by the state in Petitioner's criminal proceedings, as the state court correctly concluded, the evidence was not material. (*Id.* at 2972.)  Andrew Fulford's possession or disposal of the gun and baseball bat used in Ralph Vasquez's death has little, if any, impact on the evidence against Petitioner.  (*Id.*)  As detailed above, there is a wealth of evidence tying Petitioner to the murder of Vasquez. What happened to the bat and gun after the murder was committed does nothing to mitigate Petitioner's participation in the events culminating in Ralph Vasquez's death.  Accordingly, the prosecution in Petitioner's state court criminal proceedings did not commit a *Brady* violation by not disclosing to Petitioner the evidence concerning Andrew Fulford's assertion that he had disposed of the gun and baseball bat used in killing Ralph Vasquez.

> **v.    The Stolen Truck**

Petitioner also claims the prosecution violated *Brady* by not disclosing to the defense Christine Fulford's assertion that Ralph Vasquez actually had Andrew Fulford's permission to use Fulford's truck on the day Vasquez was killed.  This contention is without merit.

As the state court properly concluded, whether Ralph Vasquez did or did not have permission to use Fulford's truck is not *Brady* material because it is not useful as either impeachment or exculpatory evidence.  (Ex. B at 2972.)  Assuming Vasquez had permission to use the truck the evidence might be used to impeach Andrew Fulford, but not to exculpate Petitioner.  (*Id.* at 2972-73.)  Thr impeachment value, if any, would be extremely limited, however, because Fulford was not a participant in any of the events leading up to Ralph Vasquez's death.  (*Id.*)

Even assuming this information was *Brady* material, as the state court noted, it is questionable whethr the prosecution had possession of this information because no one

testified to this information during the evidentiary hearing.  (*Id.* at 2958.)   The state court therefore concluded the prosecution was unaware of this information because none of the witnesses at the evidentiary hearing testified that the information was passed on to the prosecution other than a comment by victim advocate Heather McCloud in which mentioned that she remembered Vasquez family members bringing it up at a meeting with her.  (Ex. B at 2958.)

Notably, however, this information is not material under *Brady*.  Whether Fulford's truck was stolen or whether Vasquez had permission to use the truck does not, in the state court's words, "go to the merits of the case; whether Vasquez stole or borrowed Fulford's truck has no bearing on whether [Petitioner] is guilty of murdering Vasquez." (*Id.* at 2972.)  Accordingly, the prosecution did not violate *Brady* by not disclosing to Petitioner that Andrew Fulford may have given Ralph Vasquez permission to use Fulford's truck on the day Vasquez was killed.

In sum, each of the five alleged *Brady* claims in the amended petition is without merit and, accordingly, the amended petition is due to be denied.

## Recommendation

For the foregoing reasons it is respectfully **RECOMMENDED** that the amended petition for a writ of habeas corpus, Doc. 10, be **DENIED,** and that a certificate of appealability be **DENIED**.

**IN CHAMBERS** in Gainesville, Florida, on November 22, 2011.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**